# In the United States Court of Federal Claims

**No. 02-911T**
**(Filed: August 25, 2009)**

```
* * * * * * * * * * * * * * * * * * *     *
                                          *
EDWARD A. BRINSKELE,                      *
                                          *
          Plaintiff,                      *    26 U.S.C. § 6672; Responsible Party;
                                          *    Willfulness; 26 U.S.C. § 4251; Excise
     v.                                   *    Tax; IRS Assessment - Presumption of
                                          *    Correctness.
THE UNITED STATES,                        *
                                          *
          Defendant.                      *
                                          *
* * * * * * * * * * * * * * * * * * *     *
```

*William E. Taggart, Jr.*, Oakland, CA, for plaintiff.

*Benjamin C. King, Jr.*, U.S. Department of Justice, Washington, D.C., with whom were *Acting Assistant Attorney General John A. DiCicco* and *Chief, Court of Federal Claims Section Steven I. Frahm*, for defendant.

## O P I N I O N

**FIRESTONE**, *Judge*.

This case involves the December 21, 2001 Internal Revenue Service ("IRS") assessment of the penalty provided by 26 U.S.C. § 6672 (1998), in the amount of $959,244 plus interest against the plaintiff, Edward A. Brinskele ("Mr. Brinskele" or "Brinskele"). Mr. Brinskele's now-defunct company, MTC Telemanagement, Inc. ("MTC"), was a reseller of long distance telephone service. It purchased long distance

minutes in bulk at a discount from established carriers such as Sprint and MCI and resold them to its customers at a profit.  The majority of MTC's customers were businesses that did not place enough long distance calls to qualify for this bulk discount directly from the carriers.  Throughout the case, the parties referred to the margin between the price at which MTC purchased the minutes and the higher price at which it resold them as the "markup."  The assessed amount represents the portion of estimated 26 U.S.C. § 4251 (1998) ("Section 4251") telecommunication excise tax collected by MTC from its customers on the markup in 1992, 1993, and the first three quarters of 1994.

26 U.S.C. § 6672(a) ("Section 6672") provides in relevant part that "any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax . . . [shall] be liable for a penalty equal to the total amount of the tax evaded, or not collected or not accounted for and paid over."  Mr. Brinskele paid $550 of the assessed penalty, representing the total Section 4251 tax liability for one of MTC's customers, and filed a refund claim on the grounds that MTC had not collected any Section 4251 communication excise tax from its customers on the markup, and that Mr. Brinskele therefore did not willfully fail to pay over any Section 4251 excise tax for the quarters at issue.  The IRS denied the claim, and Mr. Brinskele filed the pending lawsuit.  The defendant ("government" or "United States") counterclaimed for the balance of the assessment.

This is the second decision in this case.  In the first decision, <u>Brinskele v. United States</u>, 73 Fed. Cl. 227 (2006) ("<u>Brinskele I</u>"), <u>reconsideration denied</u>, 2006 WL 5726105 (Fed. Cl. 2006) ("<u>Brinskele II</u>"), the court considered the impact of the IRS's May 25, 2006 decision[1] not to apply the Section 4251 excise tax to the type of long distance service MTC provided.  In Mr. Brinskele's motion for summary judgment, he contended that he could not be held liable to remit excise taxes which the IRS determined were no longer owed by his customers for the type of telephone services provided by MTC.  <u>Brinskele I</u>, 73 Fed. Cl. at 228.  The court denied Mr. Brinskele's motion and held that regardless of whether MTC's customers owed the tax, MTC was required to hold the monies collected from them as federal excise tax "under color of law" as "tax in trust for the United States under [26 U.S.C.] § 7501[ (1954)]" and remit them to the IRS.  <u>Id.</u> at 234.  As explained in this court's earlier decision:

> After careful consideration, the court agrees with the government that Mr. Brinskele remains potentially liable under [Section] 6672 irrespective of the applicability of [Section] 4251 to MTC's long distance services . . . . MTC collected the federal excise tax from its customers under the "color of law" pursuant to [Section] 4251. . . . [B]ecause Mr. Brinskele concedes that at least a portion of the 3% "federal tax" MTC collected from its customers

---

[1]In its earlier opinion, the court noted:

On May 25, 2006, . . . the Department of Treasury and the IRS issued Notice 2006-50[, 2006-1 C.B. 1141].  In Notice 2006-50, the government announced that the IRS no longer contends that the phrase "distance and elapsed transmission time" in [Section] 4251 applies to long distance calls for which the charge is based only on the duration of the call.

<u>Brinskele I</u>, 73 Fed. Cl. at 230.

included some of the excise tax under [Section] 4251, MTC was acting as a "collection agent" under [Section] 7501.  As such, MTC was obligated to hold the tax in trust for the United States under [Section] 7501.  To interpret [Section] 6672 in a manner which would relieve MTC, and any responsible persons, of the obligation to remit to the government amounts erroneously collected as taxes, as Mr. Brinskele proposes here, is fraught with problems. "Collection agents" are never authorized to collect and keep taxes for themselves. . . .  MTC, and Mr. Brinskele (if he is found liable as a responsible person), were legally obligated to pay the tax to the government once it was collected.  Therefore, Mr. Brinskele is potentially liable as a responsible person under [Section] 6672 irrespective of whether MTC's long distance services were actually subject to the federal excise tax under [Section] 4251.

Id. (emphasis added throughout).

The court ordered a trial on the issue of Mr. Brinskele's liability under Section 6672.[2]  A trial was held in San Francisco from April 13 to 15, 2009, at which the court heard testimony from eight witnesses and admitted sixty exhibits regarding Mr. Brinskele's potential liability under Section 6672.  Based on the evidence received at trial and for the reasons set forth below, the court now **RULES** for the defendant as follows.

## I.   Burden of Proof

Before turning to the court's findings and conclusions, the court will first address the applicable burdens of proof in this Section 6672 "responsible person" case.

When challenging a Section 6672 assessment, "[t]he taxpayer bears the burden of proving both that he was not a responsible person and that his failure to pay over the taxes was not willful."  Stuart v. United States, 337 F.3d 31, 36 (1st Cir. 2003).  To prevail, the

---

[2]Order Den. Def.'s Mot. Dismiss, Jul. 3, 2008.

taxpayer must establish by a preponderance of the evidence that the government's

imposition of the penalty against him is erroneous. <u>Farkas v. United States</u>, 57 Fed. Cl.

134, 140 (2003), <u>aff'd</u>, 95 Fed. Appx. 355 (Fed. Cir. 2004). The taxpayer carries the

burden of proof both for his tax refund claim and against the defendant's counterclaim.

As the <u>Farkas</u> court explained, "because the government's counterclaim relies on the

same operative facts and legal conclusions as the plaintiff's claim, the taxpayer in effect

carries the burden of proof both for his own claim and against the government's

counterclaim." <u>Id.</u> (citation omitted).

In addition, the taxpayer has the burden of proving that the amount of liability

determined by the IRS is erroneous.[3] <u>Ferguson v. United States</u>, 484 F.3d 1068, 1077

(8th Cir. 2007) ("Assessments under [Section] 6672 are ordinarily presumed to be

correct."). <u>See also</u> <u>Riley v. United States</u>, 118 F.3d 1220, 1221 (8th Cir. 1997), <u>cert.</u>

<u>denied</u>, 523 U.S. 1020 (1998) ("A [S]ection 6672 assessment is presumed correct, and it

is the individual's burden to show, in a refund action, that he or she was not a responsible

person or did not willfully fail to pay over the taxes." (citing <u>Olsen v. United States</u>, 952

F.2d 236, 239 (8th Cir. 1991)). This assumption applies even if the assessment is based

on an estimate, "so long as the method for making the assessment is reasonable and

---

[3]The court acknowledges that many of these cases were decided by United States circuit courts other than the Federal Circuit. However, as the Federal Circuit recently stated, "while not binding, the decisions of other regional circuits are persuasive authority and instructive." <u>Bank of Guam v. United States</u>, 2009 WL 2448503 at *4 (Fed. Cir. 2009) (citing <u>Summit Tech. v. Nidek Co.</u>, 435 F.3d 1371, 1376 (Fed. Cir. 2006) ("[I]t is instructive to look to the law of other circuits.")).

logical." Ferguson, 484 F.3d at 1077.  In order to overcome the presumption of

correctness, the taxpayer is "required to show not only that the assessment was incorrect

but also to prove the correct amount." United States v. Sage, 412 F. Supp. 2d 406, 416

(S.D.N.Y. 2006).  The only situation in which the presumption of correctness does not

exist is where the taxpayer establishes that the IRS assessment was made "without any

foundation whatsoever, or without some predicate supporting evidence." Ferguson, 484

F.3d at 1077.  To make such a showing, the taxpayer must establish that the IRS had no

rationale whatsoever for its determination. Id.; Stuart, 337 F.3d at 35.  However, a

taxpayer who does not maintain adequate books and records "may not complain of the

inevitable inaccuracies in assessment [that] their default occasions." Ferguson, 484 F.3d

at 1078 (citing Caufield v. Comm'r, 33 F.3d 991, 993-94 (8th Cir. 1994) (quoting-in-turn

Dodge v. Comm'r, 981 F.2d 350, 353 (8th Cir. 1992) (quotation marks omitted), cert.

denied, 510 U.S. 812 (1993))).  "Where a taxpayer fails to keep such records, the

government, in attempting to establish a violation of the income tax law, may reconstruct

a taxpayer's taxable base by any reasonable method." Stuart, 337 F.3d at 35.  Therefore,

where the IRS estimates a tax liability because the taxpayer has failed to maintain

adequate records, such as the case here, courts have uniformly rejected challenges to the

presumption of correctness associated with the IRS assessment. See, e.g., Ferguson, 484

F.3d at 1078; Sage, 412 F. Supp. 2d at 416; Stuart, 337 F.3d at 35; Cook v. United States,

52 Fed. Cl. 62, 67 n.6 (2002).

Applying these standards to the evidence presented, the court makes the following findings of fact and conclusions of law.

## II.    MTC Collected a Three-Percent Charge Labeled "Federal Tax" from its Customers but Failed to Remit to the IRS the Portion of the "Federal Tax" it Collected from its Customers on MTC's "Markup."

As noted above, this court held in its earlier opinion denying the plaintiff's motion for summary judgment that MTC had an obligation to pay over to the IRS any monies it collected as federal tax "under the color of law." Brinskele I, 73 Fed. Cl. at 234 (citations omitted); see also Brinskele II, 2006 WL 5726105 at *1-*2 (same). The court rejected Mr. Brinskele's contention, which he has repeated in his post-trial briefs, that he cannot be held secondarily liable under Section 6672 because the IRS ultimately determined that the Section 4251 excise tax at issue in this case did not encompass the services provided by MTC. See Brinskele I, 73 Fed. Cl. at 234. The court further explained that regardless of whether or not the tax was properly assessed, as the entity responsible for collecting the tax, MTC could not keep the federal taxes it collected for itself, Mr. Brinskele's assertions to the contrary notwithstanding. Id.

At trial, Mr. Brinskele claimed that MTC never collected any federal excise tax in excess of the amount of excise tax MTC owed to its service carriers and thus MTC never retained any "federal taxes" owed to the IRS. Accordingly, the first issues to be resolved are whether MTC collected any federal taxes under the color of law and if so, whether it failed to remit those taxes to the government.

To answer these questions, the court heard testimony from Mr. Brinskele, several of MTC's former employees, and three accountants regarding MTC's billing practices. The undisputed testimony established that MTC was charged the Section 4251 excise tax by its service providers, including Sprint and Allnet and that it remitted at least some of these charges to them.  The disputed testimony centered on whether MTC collected, under the color of law, any federal excise tax on the margin between what MTC paid for these services and what it charged its customers.  This spread will be referred to as the "markup."

Mr. Brinskele testified that during the period in question, he believed that MTC was not liable for Section 4251 excise taxes because under the business model he had developed, MTC was not a telephone services provider.  See, e.g., Tr. 48:2 to 51:16, 82:15 to 87:12, 105:8 to 107:8, 560:17 to 561:5, 563:11-14.  According to Mr. Brinskele, only MTC's carriers were telephone service "providers" and MTC was simply a telephone service "user."

Mr. Brinskele also testified that any federal excise tax included in the "federal tax" line item on MTC's customer bills represented only that customer's proportional share of the excise tax MTC was charged by its carriers and not tax collected on the markup as well.  According to Mr. Brinskele, the rest of this three-percent charge represented other "federally regulated charges."  Tr. 34:18-19.  When asked how this amount was calculated, he stated that "federal tax was an allocation of three percent on 100 percent of the non-exempt customers that we billed."  Tr. 35:3-5.  Mr. Brinskele went on to explain

-8-

that this item represented each customer's share of the "charges that we were billed by carriers and by Pacific Bell for any federally -- at the time I believe the only federally regulated charges were FCC charges and federal excise tax." Tr. 35:20-23.  He testified that the three-percent charge included both "FCC charges" and federal excise tax.  Tr. 35:24 to 36:1.  When asked how three percent was chosen for this rate, he testified, "Well, my recollection is, is that we had determined that approximately two[-]thirds of MTC's billing was subject to federal excise tax, so three percent of two[-]thirds was equivalent to two percent of three-thirds.  Or 100 percent of the . . . non-exempt billing." Tr. 36:4-10 (emphasis added).

Mr. Brinskele's testimony that he believed in 1992, 1993 and the first three quarters of 1994 that MTC was not subject to any excise tax because MTC did not provide "phone services" and for this reason failed to remit federal excise taxes to the IRS was contradicted at trial.  First, the evidence established that Mr. Brinskele was aware at least as early as 1992 that MTC needed to collect and remit excise taxes as a telephone service "reseller," which California and other states characterized as telephone service providers.  In 1992, the California Public Utility Commission ("CPUC") notified MTC that it was subject to state excise tax as a telephone service reseller.  MTC challenged the CPUC determination, and following a hearing before the CPUC at which Mr. Brinskele testified as MTC's president, the CPUC eventually held that MTC, as a telephone service reseller, owed California over $667,000 in excise taxes.  DX 61, 62.  MTC was also fined

$20,000 for acting willfully outside the law.[4]  More specifically, the CPUC stated in its

opinion:

> In reviewing the voluminous record of this proceeding, [CPUC] can not help
> but be struck by MTC's persistently defiant conduct throughout.  We find the
> company's bold denial that it was operating as a reseller in the midst of
> proffered copies of its blatant advertisement materials, its president's
> testimony and the MTC/Sprint agreement to be tantamount to an attempt to
> intentionally mislead [CPUC] by false statement of fact . . . .  The evidence
> does not support the assertion that MTC's denial that it was a reseller was in
> good faith.  Consequently, [CPUC's] process has been abused and significant
> resources have been wasted in the course of this proceeding.

DX 61 at 750-51 (emphasis added throughout).

The evidence further established that Mr. Brinskele identified MTC as a

"provider" of telephone services to the Public Utility Commissions in Washington state in

December 1992, Oregon in September 1993, Texas in 1993, and Massachusetts in March

1994.

Taken as a whole, these facts plainly establish, contrary to Mr. Brinskele's

testimony, that MTC was a "provider" of telephone services and that MTC was therefore

required to collect the same federal and state excise taxes applicable to similar telephone

service providers during the relevant tax quarters in this case.

Second, as discussed below, the testimony and evidence presented by former MTC

employees, accountants from two firms (Arthur Andersen, LLP, and Pisenti and Brinker)

---

[4]CPUC fined MTC $10,000 for operating without a Certificate of Public Necessity, which
was required for switchless resellers, and $10,000 for violating CPUC's rule against misleading
CPUC or its staff.  DX 61 at 752.

that conducted audits of MTC, and the revenue agent who conducted the IRS audit of MTC persuasively established that MTC was collecting federal excise taxes on the markup MTC charged its customers, and that MTC did not remit the taxes it collected to the IRS during the quarters at issue.  As discussed below, the testimony of former MTC employees Eugene McCord, Tim Jaeger, and Carl Hildebrandt established that the "federal tax" MTC included on its bills to its customers constituted a three-percent charge on the full price MTC charged its customers, including the portion that represented MTC's markup.  In addition, the testimony of Mr. Jaeger and Mr. McCord, together with the testimony of the accountants from Pisenti and Brinker and Arthur Andersen, established that the federal excise taxes that were collected by MTC on the markup were never remitted to the IRS for the quarters at issue.

Carl Hildebrandt joined MTC as its director of management information systems in April 1989.  He testified, in direct contradiction to Mr. Brinskele's testimony, that he understood that the federal tax identified on MTC's bills included the portion attributable to MTC's markup.  Mr. Hildebrandt explained that Mr. Brinskele authored MTC's billing software and that this software computed the federal, state and local taxes that MTC collected from its customers.  Tr. 442:20 to 444:16.  This software was in place for the entirety of the period in question, although it was later replaced with an outside system. Tr. 444:16 to 445:3.

Mr. McCord testified that shortly after he joined MTC as its director of operations in 1993, it became clear to him that MTC was collecting excise and sales taxes that it was

not remitting to the proper government authorities.  Mr. McCord testified that his

concerns about MTC's taxation policies were first aroused when he noticed that despite

the fact that state and local tax rates change frequently, MTC charged a steady rate for

these taxes and did not account for these fluctuations.  Tr. 388:18 to 389:4.  This led him

to investigate the company's federal excise tax situation and to discover that MTC was

not remitting any taxes to the appropriate taxing authorities.  Mr. McCord testified that he

and Mr. Jaeger, who joined MTC in December of 1993 as its controller, held discussions

with Mr. Brinskele in which Mr. McCord told Mr. Brinskele that he believed that MTC's

taxation methods "had to be changed . . . the concept that taxation could impact your

revenue was, I guess, foreign to me, I'd never heard of -- it should be neutral to your

revenue recognition, and I absolutely remember having those discussions with Tim

[Jaeger] and Ed [Brinskele]."  Tr. 400:16-21.

Mr. McCord put his concerns in a memorandum that he sent to Mr. Brinskele on

March 31, 1994, in which he explained that he did not know what to do with requests for

refunds from MTC customers who were tax exempt but who had nonetheless been billed

excise taxes on the whole of their charges, including the MTC markup.  DX 50.  As Mr.

McCord explained, he did not know how to pay the refund because MTC was not

remitting the taxes:

> In the past few weeks, MTC has received at least two requests for sizeable
> refunds of taxes paid to MTC due to our customers' tax exemption status.
> Fulfillment of these refunds would not have any financial impact to MTC if
> standard industry taxation methods were in place.  However, <u>since MTC does</u>

<u>not remit tax to any taxing authorities</u>, which would allow us to deduct such refunds from future payments to these taxing authorities, there certainly is a financial impact to MTC.

My past experience in assessing sales taxes to a retail customer base strongly indicates that there are constant fluctuations in sales and use tax rates. . . . [B]ased on past experience, I know there are more fluctuations in tax rates than we are reflecting in our tax tables.

As a result of these concerns, <u>and the fact that I have never been provided with any formal documents indicating that any taxing authority concurs with MTC's current taxation methods</u>, I feel it is necessary to formally notify you that I do not concur with the taxation methods that any division of MTC[5] is currently employing.  I would recommend that significant research and revisions be made to both the procedures and the software utilized to assess taxes to our customer base.  <u>I feel the potential liability to MTC is very significant.</u> . . .

<u>Id.</u> (emphasis added throughout).  In regard to one of these refund requests, Mr. Jaeger testified that "the problem[ ] we ran into . . . is that we weren't remitting the tax on to anyone, so there was no one we could credit it back from . . . ."  Tr. 478:1-4.

Mr. Jaeger confirmed Mr. McCord's testimony.  As stated above, Mr. Jaeger joined MTC in December of 1993 as its controller.  He testified that he and Mr. McCord, who joined MTC shortly before Mr. Jaeger, quickly realized that MTC's taxing policies "didn't make sense" and began to look into them.  Tr. 462:22 to 463:5.  He stated that MTC's policies were not those typically followed at telecoms, where "you would bill your customers and you'd remit [taxes] on to the government agency you were collecting for.  And we weren't, we were not doing that in the early stages."  Tr. 464:14-19.  He testified

------

[5]As discussed below, MTC maintained a tight affiliation with several other telecommunications entities, many of which included "MTC" in their names.

that he did not recall taxes being paid to any governmental authority at the time he joined MTC. Tr. 465:21-23. When asked if MTC's taxation methods were "revenue-neutral" during the period at issue, Mr. Jaeger responded, "Likely not." Tr. 465:2-5.

The government introduced two memos written by Mr. Jaeger to Roger Sheppard,[6] both of which were copied to Mr. Brinskele. The first, dated April 5, 1994, was intended to add Mr. Jaeger's concerns about MTC's taxation methods to those that Mr. McCord had raised in his March 31, 1994 memo.

In his memo, Mr. Jaeger stated that "MTC is potentially liable for the incremental portion of taxes due on the MTC markup for all of the services." DX 51. Mr. Jaeger testified that he copied this memo to his personnel file so that there would be a record of his having raised the subject and because he "didn't want to be retaliated against." Tr. 480:25 to 481:16.

When Mr. Brinskele did not alter MTC's practices, Mr. Jaeger wrote a second memo, dated June 20, 1994 and entitled "Recovery plan," in which he explained to Mr. Brinskele that MTC's tax practices were very problematic. DX 52. The memo states:

> Gentlemen, I fear we are fiddling while Rome burns. This is the memo I started before Memorial [D]ay, and you discouraged me from finishing. I feel that it now must be sent as the issues, although given some time for discussion, are not getting solved and new problems continue to mount. . . . I am writing this under the assumption that you value my input and would want to hear my opinion on the best way to move this company out of the cash flow, regulatory reporting, financial statement preparation, billing, corporate identity confusion,

---

[6]Roger Sheppard was a co-owner of MTC and served as its chief operating officer during the period in question. Tr. 62:13-14, 396:6-7.

<u>and general operational problems we are experiencing.  We are sitting on many
time bombs[,] several of which could devastate operations or impact our cash
flow to such an extent that we might not be able to recover.</u>

As you have noticed from the myriad of memos I have written over the past
two months[,] new problems have been identified regularly.  I assume that you
hired me to locate these potential problems, attempt to quantify them, and
develop a strategy of either acceptance of the risk, after quantifying the
amount, or solving the problem on, as a minimum, a going[-]forward basis.

[. . .]

<u>I have had to take hard stances with my employers before regarding what I was
willing to represent as accurate to outside parties.</u>  I will, I am sure, be faced
with these types of choices as long as I work in corporate America, but I had
never understood the need for a severance agreement before coming to work
here.  <u>I am faced regularly with situations that I fear will lead to either my
termination or the need to take a position [in] which one of the only
alternatives to agreement on your part would be my resignation.</u> . . . <u>I want to
make this work for all of us, but sometimes feel that I am going down the path
of change alone.</u>

<u>Id.</u> (last emphasis in original).

When asked at the trial whether his efforts as memorialized in this memo

"culminated in changing to a different system for keeping track of the tax rate changes

[o]n October 1st of 1994 and changing the way that MTC was reporting for tax

purposes," Tr. 481:24 to 482:2, Mr. Jaeger answered, "Well, ultimately not enough

changed to allow me to stay with the company, so I voluntarily left . . . within a year or so

of this memo.  So I was pushing for change faster than the company was willing to accept

it . . . ."  Tr. 482:3-7.

The evidence introduced at trial established that MTC began to remit federal

excise taxes to the IRS in the last quarter of 1994, but there was no evidence introduced

to show that MTC remitted to the IRS any of the monies it had been collecting as "federal tax" prior to that quarter.[7]   Thomas Hakel, who was employed with MTC from April 1995 to May 1996 and served for part of that time as its chief operating officer, testified that while MTC had begun to remit federal excise taxes in 1994, shortly before he joined the company, he was unable to inform the court of any efforts of MTC to remit the taxes it had collected earlier and kept.   When asked whether MTC's tax issues "had been solved in . . . the last quarter of '94 and [whether] things were pretty much under control at that point in time," Mr. Hakel answered:

> Well, they hadn't been solved.  What I was pointing out was that . . . they put in systems to collect and remit taxes, based on <u>forward</u> billings from Q-3 or Q-4 . . . of 1994.  So, yes, in our mind, that was the best solution available to us . . . <u>going forward,</u> and we were obviously discussing whether or not there was any liability <u>preceding that.</u>

Tr. 508:10-19 (emphasis added).

---

[7]In this connection, the court notes that when MTC finally began remitting the federal excise taxes collected on the markup to the IRS in the last quarter of 1994, nothing changed in MTC's billing practices from the bills it had sent its customers before then.  Despite the fact that MTC acknowledged in that quarter that it was obliged to collect the tax based on the amount it charged its customers, the rate at which it billed its customers did not increase.  This was observed in an IRS Form 886-A, "Explanation of Items," which was provided to MTC to explain the assessment.  PX 19.  Based upon its audit, the IRS noted:

> [B]etween the date of incorporation, January 1, 1989 to the end of 1994, MTC did not change the way it was doing business.  <u>MTC has always been billing its customers federal excise tax at 3%.</u>  However, it is noted that MTC began filing federal excise tax returns beginning the fourth quarter of 1994 . . . .  However, based on all documents provided, MTC should have been filing returns since before 1991 as MTC was billing and <u>collecting federal excise tax.</u>

PX 19 at 7 (emphasis added throughout).

-16-

The government also presented the testimony of John Caldwell, who was an audit manager with Arthur Andersen during the relevant time frame.  Mr. Caldwell testified that Arthur Andersen conducted reviews[8] of MTC's financial statements from May 1990 to October 1994.[9]  The government introduced into evidence a memorandum to file by Mr. Caldwell memorializing a conference call he and others at Arthur Andersen held with Mr. Brinskele, Mr. Sheppard and Mr. Jaeger.  DX 45.  The conference call concerned "the collection and payment of federal excise taxes, state and local taxes, and surcharges for 911 service and deaf and disabled facilities" and referred to these collectively as "Sales Taxes."  DX 45 at 626.  The memo stated:

> The collection and payment of Sales Taxes by MTC became an issue when we were unable to determine how the amounts billed to customers were being calculated.  It appeared that MTC would remit to their carriers the amounts included on the carrier bills, which we believed to represent the net carrier expense to MTC and then charge Sales Taxes to their customers based upon the "marked up" price which the customers are billed.  This indicated that there was a spread between the basis upon which MTC remitted Sales Taxes to the carriers and the basis upon which they charged it to their customers.  This spread is their gross margin or management fee.  While the customers were told that they were being charged taxes on this spread, no taxes were ever remitted to any taxing authority related to the management fee.  We became concerned that this might not be legal and that a significant liability for unpaid Sales Taxes might exist.

---

[8]Mr. Caldwell testified that "[a] review is a standard of reporting that the accounting profession is accorded by professional standards to report based upon a level of work that is performed on the financial statements," and that a review "is substantially less in scope than a certified audit."  Tr. 522:13-21.

[9]Although completed in 1994, Mr. Caldwell stated that this review covered only "the year ended December 31st, 1993."  Tr. 523:3-6.

Id. (emphasis added throughout).  At trial, Mr. Caldwell affirmed that this was discussed

with Mr. Brinskele in the conference call.[10]  Tr. 524:16 to 526:9.

Next, the government presented the testimony of Eileen Wheatman,[11] who, while

employed at Pisenti and Brinker, served as audit manager for an audit of MTC.  Ms.

Wheatman testified that in the course of the audit, she became aware that MTC was

"collecting but not remitting" state and federal excise taxes.  Tr. 423:7-19.  In a memo

from Ms. Wheatman to the Pisenti and Brinker partner in charge of the account, entitled

"Memo on Engagement and Audit Risks," Ms. Wheatman wrote:

> In the normal course of business, MTC has been collecting various states'
> taxes and federal excise taxes and [has] not been remitting them to the proper
> authorities.  [MTC] has attempted to calculate the federal excise tax for 1994;
> however, [MTC] has not been remitting the taxes since inception.  The actual
> liability for these taxes is unknown.  (This changed during the last quarter of
> 1994[,] at which time they did remit the 1994 fourth quarter federal excise
> tax[.)]

DX 53 (emphasis added).  The evidence also included a memo and related workpapers

prepared by Ms. Wheatman in which she estimated MTC's unpaid federal excise tax

liability for 1994 to be $487,463.  DX 54; Tr. 429:4 to 431:17.  The evidence showed that

---

[10]Mr. Caldwell also testified that Arthur Andersen discussed with Mr. Brinskele its
concerns about the failure of a related entity, Envoy, to remit federal excise tax.  Tr. 528:10 to
529:8.  Indeed, the evidence established that Arthur Andersen informed Mr. Brinskele of tax
issues it found with regard to several entities related to MTC.  The defendant introduced four
1994 memos from Arthur Andersen to Mr. Brinskele documenting these concerns.  DX 41, 42,
43 & 46.

[11]At the time, Ms. Wheatman went by the name "Eileen Davis," which is the name that
appears in the exhibits she prepared.

to calculate the amount of federal excise tax due, Ms. Wheatman subtracted the amount of

federal excise tax that MTC remitted to the carriers throughout the year and the amount

MTC remitted directly to the IRS in the fourth quarter of 1994 from the amount of federal

excise tax MTC billed its customers.  Id.  Ms. Wheatman's firm prepared MTC's

financial statements for 1994 and included this amount, $487,463, as "[f]ederal excise tax

payable."[12]  DX 55 (emphasis added).

Finally, the government presented the testimony of Carol Reynolds, the IRS

revenue agent who conducted the IRS audit of MTC.  She testified that MTC did not file

any federal excise tax returns prior to the fourth quarter of 1994.  On both the first and

second day of trial, Ms. Reynolds testified at length regarding the procedures and

methodology behind the IRS's determination and assessment of MTC's liability for

unpaid federal excise tax.  For example, Ms. Reynolds testified that she examined the

Arthur Andersen reviews and Pisenti and Brinker audit referenced above, as well as the

workpapers that accompanied those reviews.  She also testified that she examined some

customer bills in assessing MTC's federal excise tax liability.  When asked whether MTC

collected federal excise tax from its customers, Ms. Reynolds stated, "[b]ased upon the

---

[12]It is noted that Mr. Brinskele maintains that he believed this item to "[r]epresent[ ] a
reserve because at the time[,] Pisenti & Brinker did not know what federal excise - - what
services MTC provided that federal excise tax might apply to," Tr. 71:4-6, and that it merely
represented what "Pisenti & Brinker believed was a potential liability," Tr. 72:2-3.  This
testimony is belied by Ms. Wheatman's testimony to the contrary, as well as the content of the
memo Ms. Wheatman wrote to her supervising partner.  See DX 53.

sample customer billings . . . MTC billed its customers and on the summary page of the bill it said it was federal tax, yes."  Tr. 292:9-13.

Based on the overwhelming evidence presented at trial by MTC's former employees and the three accountants, the court finds that Mr. Brinskele's testimony was not credible and that Mr. Brinskele failed to sustain his burden of showing that MTC never charged or collected the Section 4251 federal excise tax on its markup to its customers for the quarters at issue in this case.  The evidence provided by MTC's employees and accountants established that the "federal tax" MTC collected from its customers included the Section 4251 federal excise tax on MTC's markup over the amount MTC was charged by its carriers.  The evidence further established that MTC never remitted to the IRS the amount of federal excise tax that it collected on its markup for the quarters at issue.

## III.   Mr. Brinskele Was a "Responsible Person" for Purposes of Section 6672.

As stated above, Section 6672 provides in relevant part that "any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax . . . [shall] be liable for a penalty equal to the total amount of the tax evaded, or not collected or not accounted for and paid over."  26 U.S.C. § 6672(a).  The case law typically refers to the person required to "collect, truthfully account for, and pay over" the tax as a "responsible person."  See, e.g., Jefferson v. United States, 546 F.3d 477, 479 (8th Cir. 2007); Bowlen

-20-

v. United States, 956 F.2d 723, 726 (7th Cir. 1992); Feist v. United States, 607 F.2d 954,

960 (Ct. Cl. 1979).

An individual is considered a responsible person "if he retains sufficient control of

corporate finances that he can allocate corporate funds to pay the corporation's other

debts in preference to the corporation's . . . tax obligations." Jefferson, 546 F.3d at 480

(quoting Bowlen, 956 F.2d at 728 (internal quotation marks omitted)).  "As a general

proposition it may be safely postulated that one who is the founder, chief stockholder,

president, and member of the board of directors of a corporation . . . is rebuttably

presumed to be the person responsible under [Section 6672] . . . ." Feist, 607 F.2d at 960

(quoting McCarty v. United States, 437 F.2d 961, 967-68 (Ct. Cl. 1971)); see also

Jefferson, 546 F.3d at 480-81 (holding an officer liable where that officer had "significant

involvement" in the corporation's financial affairs); Godfrey v. United States, 748 F.2d

1568, 1576 (Fed. Cir. 1984) ("[W]here a person has authority to sign the checks of the

corporation or to prevent their issuance by denying a necessary signature or where the

person controls the disbursement of the payroll or controls the voting stock of the

corporation he will generally be held 'responsible.'" (internal citations omitted)).[13]

---

[13]The court emphasizes that being a "responsible person" is not the same thing as being
liable for the Section 6672 penalty; that is, a finding that someone is a responsible person is a
separate finding from that of whether such person acted wilfully in not paying the tax.  See Mazo
v. United States, 591 F.2d 1151, 1156 (5th Cir. 1979) ("responsibility is a matter of status, duty
and authority, not knowledge").  Thus, assessing liability under Section 6672 first requires a
finding as to whether someone is a responsible person, and if so, next a finding as to whether that
person acted willfully.  Whether Mr. Brinskele acted willfully is addressed in Section IV, infra.

Additionally, "[t]here may be more than one responsible person." Stuart, 337 F.3d at 36 (citing Harrington v. United States, 504 F.2d 1306, 1312 (1st Cir. 1974) ("The term 'person' is to be construed to include all those connected with a corporation so as to be responsible for the performance of the act in respect of which the violation has occurred. . . . [M]ore than one person may be liable.") (emphasis added throughout)).  Thus, a finding that others at MTC shared some responsibility would not preclude a finding that Mr. Brinskele is a "responsible person" under Section 6672.

The evidence established that Mr. Brinskele founded MTC in 1987 and from its founding until July 1996, served as its chief executive officer.  Tr. 28:11-17, 73:17-20, 396:6, 396:14, 445:11, 469:1-7, 474:8-9.  At all times material, he was also MTC's controlling shareholder.  Tr. 228:24 to 229:1.  Further, there is no dispute that until the summer of 1994, when MTC switched to an automated check processing system, Mr. Brinskele signed many of MTC's checks.[14]  The government introduced into evidence a

---

[14]Mr. Jaeger testified that when he arrived at MTC in late 1993, he discovered that the company's finances were largely being run by Mr. Brinskele out of a series of checkbooks in his possession.  Mr. Jaeger testified that "there really weren't books as you'd expect them to be. There were multiple legal entities that were involved, and it was really run out of a series of checkbooks."  Tr. 466:5-8.  As Mr. Jaeger explained:

[O]ne of the first things I did was [to go] down and ask Arthur Andersen how they had done the prior year's financial filings when there were more than one legal entity . . . and they were mixing and mingling checkbooks from all different legal entities, I mean, it made no sense at all, the numbers that they were doing, based on all the different checkbooks that were out there at MTC that I was stumbling across, etc.

[. . .]

We would find checkbooks.  Ed [Brinskele] had a number of checkbooks from

-22-

signature card for two MTC accounts opened at Wells Fargo Bank on August 10, 1993

that showed Mr. Brinskele to be a signatory on those accounts.  DX 40.  Also in evidence

are several checks drawn on one of these accounts as well as checks drawn on an MTC

account at another bank.  Id.  Mr. Brinskele testified that all of these checks bore either

his handwritten signature or his signature stamp.  Tr. 239:14 to 240:24.  Mr. Jaeger

testified that after MTC began using the automated check processing system, the system

would generate a list of all checks that were due which would then go to Mr. Brinskele or

his "backup," Mr. Sheppard, for approval before they were issued.  Tr. 488:8 to 489:16.

Additionally, Mr. Jaeger testified that "Ed [Brinskele] was involved in every memo and

decision . . . [.] [Y]ou didn't make a move without Ed being involved."  Tr. 469:14-16.

 Based on the foregoing evidence, the court finds that Mr. Brinskele was

responsible for the financial decisions for MTC for purposes of Section 6672 during the

period in question and therefore can be held liable for the IRS assessment if his actions

are found to have been "willful."

---

different banks around the [B]ay [A]rea in his office that he would write checks on[.]
. . . [O]ne of the first things I did was [to have] all the bank statements start coming
to me so I could start finding out just how [many] different cash accounts we had out
there. . . . There were a . . . significant number [of accounts] that weren't accounted
for by Arthur Andersen prior to that.

Tr. 484:13 to 485:10 (emphasis added throughout).  Mr. Brinskele later confirmed on re-direct
that he did have a number of checkbooks.  Tr. 556:4-8.

**IV.    Edward A. Brinskele Acted Willfully in Failing to Pay the Section 4251 Tax to the IRS.**

In order to be liable under Section 6672, the responsible person must have acted "willfully" in not paying the taxes.  26 U.S.C. § 6672(a).  Willfulness has been described by the Federal Circuit as "a deliberate choice voluntarily, consciously, and intentionally made to pay other creditors instead of paying the Government.  Willful conduct may also include a reckless disregard of an obvious and known risk that taxes might not be remitted."  Godfrey, 748 F.2d at 1577 (internal citations and quotation marks omitted).  A reckless disregard of a known risk is present where "the responsible person knew or should have known of a risk that the taxes were not being paid, had a reasonable opportunity to discover and remedy the problem and yet failed to undertake reasonable efforts to ensure payment."  Farkas, 57 Fed. Cl. at 143 (quoting Cook, 52 Fed. Cl. at 70 (internal quotation marks and further citations omitted)); see also Whiteside v. United States, 26 Cl. Ct. 564, 573-74 (1992); Hammon v. United States, 21 Cl. Ct. 14, 27 (1990).

The evidence established that Mr. Brinskele's behavior in this case was, at all times, clearly willful.  As discussed at length above, Mr. Brinskele knew that MTC, as a telephone service reseller, was considered to be a telephone service provider in California and several other states.  Mr. Brinskele further knew from meetings and memoranda he received that MTC was collecting federal excise taxes on MTC's markup and that MTC was required to remit the federal excise tax it was collecting on its markup to the IRS for

the quarters at issue.  The evidence further established that MTC did not begin to remit

federal excise taxes until the last quarter of 1994.

While the court will not repeat here all of its findings from Section II and III, it is

clear from the testimony of Mr. McCord and Mr. Jaeger that Mr. Brinskele was told that

he was legally obligated to collect federal excise taxes and was urged to start remitting

federal excise tax on the MTC markup.  This evidence included memoranda to Mr.

Brinskele from both of these witnesses, exhorting him, sometimes in dire tones, to begin

paying these taxes (e.g., "I fear that we are fiddling while Rome burns," DX 52 at 646).

Mr. Caldwell also testified about how Arthur Andersen informed Mr. Brinskele of their

concerns about MTC's failure to remit the federal excise taxes that MTC collected on the

markup.  Tr. 524:16 to 526:9.  Yet despite the fact that Mr. Brinskele was involved in what

he himself termed a "constant dialogue" with others at MTC over the tax issue that

involved "lots of discussions," Tr. 178:15-20, Brinskele routinely elected to pay other

creditors instead of paying the government.  The uncontroverted evidence demonstrated

that during this time, Mr. Brinskele regularly signed checks on behalf of MTC.  Indeed,

Mr. Jaeger testified that until his arrival in late 1993, the company's finances were

managed through a number of checkbooks from "different banks around the [B]ay [A]rea"

kept by Mr. Brinskele in his office.  Tr. 485:1-6.  Some of these payments were to Mr.

Brinskele himself.  For example, the evidence included a June 1994 memo from Mr.

Jaeger in which he takes issue with the fact that Mr. Brinskele "continue[s] to have [his]

-25-

personal bills paid by MTC." DX 52 at 648. The evidence included records kept by Judy

Pieratt, a third-party bookkeeper for MTC for 1992, which reflected $253,496.30 in 1992

"accounts receivable distributions" to Mr. Brinskele. DX 39. Mr. Brinskele testified that

in addition to receiving a salary "approximately between 50 and 200 thousand dollars,"

between 1992 and 1994, he also received a distributable share of the profits in these years,

which is commonly referred to as "K-1 income" after the IRS schedule on which it is

reported. The defendant introduced Mr. Brinskele's Schedule K-1 from 1993 into

evidence, which showed a $429,118 distribution from MTC.[15] DX. 66.

In view of the foregoing, there can be no doubt that during 1992, 1993, and the first

three quarters of 1994, Mr. Brinskele both knew of his obligation to remit the federal

excise tax collected on the markup and showed a reckless disregard of MTC's tax

responsibilities by failing to remit these funds to the IRS when they were collected.

The evidence further established that Mr. Brinskele can also be held liable for

willfully failing to act after MTC began remitting to the IRS the federal excise taxes it

collected on its markup starting in the fourth quarter of 1994. In particular, Mr. Brinskele

acted willfully when he failed to authorize MTC to go back and remit to the government

the federal excise taxes MTC had previously collected. Courts have consistently held that

---

[15]In fact, the evidence strongly suggested that Mr. Brinskele consistently took MTC funds for his personal use. For example, Mr. Brinskele testified that he took a loan from MTC for the construction of his house, although he could not recall the amount, what year it was issued, whether he signed a promissory note and most importantly, whether he paid it back. Tr. 233:3-12.

a responsible person under Section 6672 who becomes aware that taxes went unpaid in past quarters in which he or she was a responsible person is under a duty to use all unencumbered funds available to the corporation to pay those back taxes or else such nonpayment is deemed "willful."  See Thosteson v. United States, 331 F.3d 1294, 1300-01 (11th Cir. 2003) (citing Mazo, 591 F.2d at 1157 (holding responsible persons liable under Section 6672 for willful nonpayment where they discovered the corporation's liability only in a later quarter and yet still refused to pay)), cert. denied, 540 U.S. 1105 (2004); United States v. Kim, 111 F.3d 1351, 1357 (7th Cir. 1997) ("[I]t is settled law that a responsible person who becomes aware that taxes have gone unpaid in past quarters in which he was also a responsible person, is under a duty to use all unencumbered funds available to the corporation to pay those back taxes." (citation and internal quotation marks omitted)); Honey v. United States, 963 F.2d 1083, 1089 (8th Cir. 1992).

The evidence established that MTC had sufficient funds to pay the back taxes at issue after the last quarter of 1994.  In 1996, while Mr. Brinskele was still a responsible person at MTC, MTC received a significant capital infusion from Yorkton Securities ("Yorkton").  Mr. Hakel testified as follows:

> [Defendant's Counsel:]  Do you recall, prior to your leaving MTC, had Yorkton been able to obtain any capital for them?
> [Mr. Hakel:] Capital had come in right around that time, I don't know the exact date.
> [Defendant's Counsel:] Do you recall the amount?
> [Mr. Hakel:] I believe, again I . . . did not look back, I believe ultimately the amount was about $20 million of convertible debentures.

Tr. 498:2-9 (emphasis added).  Although Mr. Brinskele testified, "My recollection was that it was more like 10 [million]," Tr. 564:1-2, even this lower amount is far in excess of MTCs outstanding federal excise tax liability.  This evidence is more than sufficient to show that Mr. Brinskele acted willfully by failing to remit any of the back federal excise taxes that MTC had collected on the markup after MTC accepted responsibility for collecting and remitting federal excise taxes in the last quarter of 1994.

In sum, the court was presented with overwhelming evidence that established that Mr. Brinskele acted willfully in failing to remit any of the excise taxes MTC had collected on the markup at all times relevant, both before and after the start of the fourth quarter of 1994.

**V.      The Plaintiff Has Not Met His Burden in Proving That the IRS Assessment Is Flawed.**

The last issue to be resolved concerns the amount of the IRS assessment. "Assessments under [Section] 6672 are ordinarily presumed to be correct." Ferguson, 484 F.3d at 1077 (citing Riley, 118 F.3d at 1221).  "This presumption applies even if the assessment is based on an estimate, so long as the method for making the assessment is reasonable and logical." Ferguson, 484 F.3d at 1077 (citing Dodge, 981 F.2d at 353).  To rebut this presumption of correctness, the taxpayer bears the burden to prove "not only that the assessment was incorrect but also to prove the correct amount." Sage, 412 F. Supp. 2d at 416.  "Taxpayers who cannot produce adequate records may not complain of the inevitable inaccuracies in assessment [that] their default occasions." Ferguson, 484 F.3d

at 1078 (quoting <u>Caufield</u>, 33 F.3d at 993-94 (quoting-in-turn <u>Dodge</u>, 981 F.2d at 353

(internal quotation marks omitted))).

The government introduced into evidence thirteen exhibits documenting the work

that Ms. Reynolds and others did in preparing the assessment, including Ms. Reynolds's

detailed workpapers and reports.  In one such report, Ms. Reynolds wrote:

> It should be noted that MTC's records prior to 1994 are "skimpy", in fact the
> prior accounting system . . . is not accessible.  The company cannot locate any
> prior general ledger printouts.  However, MTC can locate some of the monthly
> Profit and Loss Statements and Balance Sheets. . . .   Customer bills for 1993
> were requested.  However, the company is unable to print these from their tape.
> I was able to locate some 1993 carrier invoices from third parties.  <u>These were</u>
> <u>reviewed</u> . . . . Customer bills for 1992 were also unavailable.  However, some
> carrier bills for US Sprint were obtained from third parties.   <u>These were</u>
> <u>reviewed.</u>

DX 6 at 34-35 (emphasis added throughout).

Several witnesses testified that MTC's financial records, including those pertaining

to its tax situation, were inadequately kept.  For example, Mr. Jaeger testified that when he

joined MTC, the accounting systems were "a mess," Tr. 484:4-6, that "there really weren't

books as you'd expect them to be," Tr. 466:5-6, and that "there were multiple legal entities

that were involved, and it was really run out of a series of checkbooks." Tr. 466:6-8.  He

added that "[t]he company did not have what I would call a formal general ledger when I

arrived." Tr. 466:8-10.

Mr. Brinskele introduced no evidence and elicited no testimony to show that the

IRS assessment was incorrect.  Nor did he introduce any evidence or elicit any testimony

to prove the correct amount.

The court reiterates that the plaintiff bears the burden of proving both that the assessment was incorrect and proving the correct amount.  Sage, 412 F. Supp. 2d at 416. Given that the plaintiff has failed to provide any evidence to show that the assessment was incorrect, nor has he attempted to refute the government's voluminous evidence and the extensive testimony of Ms. Reynolds supporting the validity of the assessment, the plaintiff has failed to meet this burden.  Accordingly, the court concludes as a matter of law that the IRS assessment was correct.

## VI.   Edward A. Brinskele Is Liable for the Full Amount Determined by the IRS in its 2001 Assessment.

For the above-stated reasons, the plaintiff's refund claim is **DENIED** and the government's counterclaim is **GRANTED**.  Judgment shall await twenty days until the government provides a final calculation on its counterclaim.  Upon the filing of this calculation, the Clerk shall enter judgment for the defendant on the counterclaim.  Costs shall be awarded to the defendant.

**IT IS SO ORDERED.**


s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge